IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ANTHONY BEARD                                                                                    PLAINTIFF

v.                                            No. 4:12-cv-00483 KGB

ARKANSAS DEPARTMENT OF
CORRECTION                                                                                       DEFENDANT

**OPINION AND ORDER**

Plaintiff Anthony Beard brings this action under 42 U.S.C. § 2000e, Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and Ark. Code Ann. § 16-123-101, the Arkansas Civil Rights Act ("the ACRA"). Mr. Beard alleges race discrimination. Defendant Arkansas Department of Correction ("ADC") filed its motion for summary judgment on Mr. Beard's race discrimination and retaliation claims (Dkt. No. 22). Mr. Beard filed his response in opposition to the ADC's motion for summary judgment (Dkt. No. 27). The ADC replied to Mr. Beard's response (Dkt. No. 30). For the reasons that follow, the ADC's motion for summary judgment is granted.

**I.      Factual Background**

Mr. Beard was hired by the ADC as a correctional officer in 2004. In 2011, at Mr. Beard's request, the ADC transferred him to Work Release as a Community Employed Transportation Officer.

The ADC publishes "Post Orders", which Mr. Beard signed, laying out ADC policies for transit officers (Dkt. No. 24, ¶ 3). The ADC maintains that Post Orders prohibit, among other things, a Transportation Officer leaving a vehicle unattended with inmates inside the vehicle and that Mr. Beard received additional instruction and training from the ADC that prohibited, among

other things, personal use of ADC vehicles as well as leaving inmates unattended (Dkt. No. 24, ¶¶ 4, 5). Mr. Beard disputes this.

Mr. Beard acknowledges that Number IV of a Post Order in effect January 19, 2012, titled "Vehicle Trouble" provides rules in the event of ADC vehicle malfunction, including the requirement that officers never leave the vehicle unattended with inmates inside (Dkt. No. 28, ¶¶ 1, 3).

Mr. Beard also describes an ADC staff briefing meeting conducted pursuant to the posting of Briefing Notes for the Benton Unit dated July 28, 2010. At that staff meeting regarding the briefing note on personal shopping, Mr. Beard contends he asked Major Robert Plant what the briefing note meant by "no stopping to do personal shopping" and specifically asked whether that meant no stopping to get something to eat (Dkt. No. 28, ¶ 30). Mr. Beard contends that, at that time, Major Plant advised officers that they could stop to get something to eat but could not stop to do personal shopping, giving examples of prohibited conduct (*Id*.).

Mr. Beard further claims that, before and after the staff meeting, he saw other transport officers purchase gas for an ADC vehicle with the ADC credit card at a gas station near the ADC Benton Unit and then leave the ADC vehicle to enter the gas station that also housed a McDonald's to purchase food. Mr. Beard claims he saw inmates on the ADC buses or vans while transport officers purchased food at the McDonald's (Dkt. No. 28, ¶¶ 32–34).

On January 19, 2012, Mr. Beard was scheduled to pick up work release inmates at Oakley Trucking Company ("Oakley"). Mr. Beard arrived at Oakley with 27 other inmates in the ADC bus he was driving whom he had picked up from other work release sites. When Mr. Beard arrived at Oakley, according to Mr. Beard, the work release inmates at Oakley were not ready to be picked up. Mr. Beard then drove the van, with the inmates inside, to a Church's

Chicken on Broadway, a main thoroughfare in North Little Rock, Arkansas, approximately one-half mile from Oakley, to get something to eat. Mr. Beard parked the ADC bus containing the 27 inmates in a parking lot adjacent to Church's Chicken and went inside the Church's Chicken to order his food. Mr. Beard alleges he was away from the bus, which was in sight the whole time, for a few minutes (Dkt. No. 28, ¶ 8). He contends there were no other customers ahead of him, and he was able to secure his order within a few minutes (*Id.*). He also contends that he parked the bus containing the inmates in a position where he was able to observe the inmates on the bus and the front door of the bus (*Id.*). The exit door in the back of the bus is bolted and locked and cannot be opened, according to Mr. Beard (*Id.*).

At the time Mr. Beard left the bus, the bus he was driving was not having any kind of vehicle trouble as per the Security Post Order (Dkt. No. 28, ¶ 9). Mr. Beard claims that, based on the information he received from Major Plant at the staff meeting, he had a good faith belief that it was appropriate and did not violate any ADC policy or rules for him to stop to get something to eat during the course of his day transporting inmates (Dkt. No. 28, ¶ 31).

While inside the Church's Chicken, Mr. Beard received a phone call from Mr. Wayne Hicks informing him the work release inmates were ready for pickup. Mr. Hicks is a former work release inmate who was at the time of these events an employee of Oakley (Dkt. No. 28, ¶ 10). Mr. Beard alleges he received another phone call from Mr. Hicks while Mr. Beard was on his way back to Oakley to pick up the work release inmates telling him "he needed to get out of Church's Chicken and come and pick up the inmates" (Dkt. No. 28, ¶11).

Upon arriving at Oakley, Mr. Beard went inside the facility to speak with someone about Mr. Hicks's calls. Mr. Beard requested the supervisor, and Jeff Kumpe identified himself. Mr. Beard and Mr. Kumpe exchanged words. Mr. Beard contends that he told Mr. Kumpe that he

3

was trying to see if there was a problem and to report that Mr. Hicks had called him on at least two occasions prior to his arriving for the pickup of the inmates (Dkt. No. 28, ¶ 12). The ADC characterizes this exchange as a confrontation (Dkt. No. 24, ¶¶ 16–21, 23). It is unclear from the record the content or nature of the exchange, whether Mr. Beard threatened or intimidated Mr. Kumpe, and whether Mr. Kumpe asked Mr. Beard to leave the premises, as the ADC contends. Mr. Beard denies the ADC's contentions and maintains he did not raise his voice, did not threaten Mr. Kumpe, maintained a clam demeanor and respect for Mr. Kumpe throughout the exchange, and was not in any way the aggressor (Dkt. No. 28, ¶¶ 18, 19).

That day Mr. Beard also completed an 005 Incident Report form. He contends he spoke with Royce Tittle, the person responsible for scheduling the pickup and delivery of work release inmates. He claims Mr. Tittle advised him to complete an 005 Incident Report form and said that, because of the ongoing issues around the altering of the pickup schedule for work release inmates, Mr. Tittle would contact Oakley (Dkt. No. 28, ¶¶ 24, 25). The ADC contends that, on that form, Mr. Beard "admitted to having left the Oakley jobsite, driven to Church's Chicken, left an ADC bus with 27 inmates on it unattended while he entered the restaurant to purchase a meal for himself" (Dkt. No. 31, at 6).

Mr. Beard admits that, on January 31, 2012, Mr. Toby Bishop, a shop supervisor at Oakley, signed a statement in which he acknowledged that he requested that Mr. Beard "not be allowed to return to Oakley property after his incident with one of our employees (Jeff Kumpe)" (Dkt. No. 28, ¶ 28). Mr. Beard also admits that Mr. Kumpe completed a statement in which he admits he requested on January 20, 2012, "not to have Mr. Beard back on Oakley property" (*Id.*). Mr. Beard contends that there was no mention of the ADC contract with Oakley (*Id.*). The ADC alleges that, based on the incident, Mr. Bishop informed the ADC that Oakley would cancel its

contract with the ADC due to workplace safety concerns if Mr. Beard were allowed to continue transporting inmates to Oakley (Dkt. No. 24, ¶ 23).  In support of this contention, the ADC cites the findings of fact from the State Employee Grievance Appeal taken by Mr. Beard, which, in turn, rely upon Mr. Bishop's testimony at the Internal Review Hearing and his statement (Dkt. No. 24-1, at 4 n.23).

On January 20, 2012, Mr. Richard Vinyard, Work Release Supervisor, sent Mr. Beard home and began an investigation into the events that occurred with Mr. Beard and at Oakley.  At the conclusion of Mr. Beard's employee review hearing subsequent to the investigation, Mr. Beard was terminated for violating several of the ADC's employee conduct standards (Dkt. No. 24, ¶36).  Specifically, Mr. Beard was terminated for violating:  (1) AD 10-19, Section 1, subsection N: conduct unbecoming a public employee, (2) AD 10-19, Section 1, subsection P: violation of published policies, (3) AD 10-19, Section 6, subsection A: unsatisfactory work performance, (4) AD 10-19, Section 12, subsection A: discourteous treatment of others, (5) AD 10-19, Section 12, subsection B: insolence to supervisor or persons of higher rank / presumptuous and insulting manner of speech / rude and disrespectful, (6) AD 10-19, Section 17, subsection A: failure to perform or carry out work related instructions when such instructions are reasonable and within the employee's ability to perform and would not pose a safety or welfare hazard to the employee, and (7) AD 10-19, Section 17, subsection B: deliberate refusal to carry out reasonable work requests and/or instructions will be construed as insubordination.

On February 15, 2012, Mr. Beard completed a Step 1 Grievance Form, grieving that his termination was due to his race.  A Grievance Hearing was held on March 1, 2012, wherein the committee voted unanimously to uphold Mr. Beard's termination.  At the hearing, Mr. Beard was present and testified on his own behalf (Dkt. No. 24, ¶¶ 46, 47).  Oakley employees, including

Mr. Bishop, also testified at the hearing (Dkt. No. 24, ¶ 51).  The committee found Mr. Beard guilty of several of the same—but fewer—employee conduct standards as cited in support of the initial decision to terminate his employment.  At his grievance hearing, Mr. Beard was found guilty of violating the policies identified in :  (1) AD 10-19, Section 1, subsection N: conduct unbecoming a public employee, (2) AD 10-19, Section 1, subsection P: violation of published policies, (4) AD 10-19, Section 12, subsection A: discourteous treatment of others, (6) AD 10-19, Section 17, subsection A: failure to perform or carry out work related instructions when such instructions are reasonable and within the employee's ability to perform and would not pose a safety or welfare hazard to the employee, and (7) AD 10-19, Section 17, subsection B: deliberate refusal to carry out reasonable work requests and/or instructions will be construed as insubordination.  After the grievance hearing, Mr. Beard was found not guilty of violating the policy identified in (5) AD 10-19, Section 12, subsection B: insolence to supervisor or persons of higher rank / presumptuous and insulting manner of speech / rude and disrespectful.  The appeal decision made no mention of the policy identified in (3) AD 10-19, Section 6, subsection A: unsatisfactory work performance.

The Committee's recommendations were referred to Director Ray Hobbs for a final decision on March 7, 2012.  On March 12, 2012, Director Hobbs upheld the decision to terminate Mr. Beard.  On March 19, 2012, Mr. Beard rejected Director Hobbs's decision and requested his grievance be referred to the State Employee Grievance Appeal Panel.  Before the appeal, on April 22, 2012, Mr. Beard filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination.  On May 8, 2012, the EEOC issued Mr. Beard a Right-to-Sue letter.

On August 6, 2012, Mr. Beard filed his complaint in this Court. On August 7, 2012, Mr. Beard's State Employee Grievance Appeal Panel hearing was held. Mr. Beard argued that the ADC treated a Caucasian officer, Daniel Golden, more favorably than Mr. Beard in a similar incident. The Panel found Mr. Beard did not meet his burden of proof to show his termination resulted from race discrimination rather than some other valid reason and affirmed the ADC's termination of Mr. Beard.

Specifically, in regard to the contention that Officer Golden was treated more favorably than Mr. Beard, the State Employee Grievance Appeal Panel in its decision determined:

> While facially similar at first glance, the facts of the 2011 incident differ from the current matter in four significant ways. First, Officer's Golden's infractions did not stem from his performance of personal errands or shopping while on duty. At all times, Officer Golden was in the scope of his employment. Second, Officer Golden never abandoned his vehicle with inmates inside. When Officer Golden arrived at Rineco, one inmate got on the van. Later, Officer Golden and the inmate got out of the van, and went to the side door of Rineco where he directed the remaining inmates to get inside of the van. Third, while it is apparent that both officers argued with their respective Work Release sponsors, Officer Golden's argument did not result in him being asked to leave the premises entirely. Officer Golden was instructed to leave a secure area, and return to his van. Lastly, Officer Golden did not threaten his Work Release sponsor such that the sponsor felt it necessary to cancel the Work Release Program if Officer Golden continued transporting inmates.

(Dkt. No. 24-1, at 7).

During discovery, Mr. Beard identified five ADC employees who he claims violated the same or similar policies but were not disciplined as adversely as he was. He identified Officer Golden, Jason Pilkington, Josh Teel, Woodrow Turner, and Justin Corley (Dkt. No. 24, ¶ 89). The ADC maintains that none of these individuals are proper comparators to Mr. Beard (Dkt. No. 24, ¶¶ 90–100). In his response to the ADC's motion for summary judgment, Mr. Beard also identifies John Broadway, a Caucasian male, as a potential comparator (Dkt. No. 28, ¶ 50).

II.     **Standard of Review**

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Hollway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010) (quoting *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999)) (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006))). "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized

and should not be followed." *Id.* Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III. Retaliation Claim

The ADC moves for summary judgment on Mr. Beard's retaliation claim. Mr. Beard alleged retaliation in his original complaint (Dkt. No. 2) but did not reassert that claim in his amended complaint (Dkt. No. 7). For this reason, Mr. Beard's retaliation claim is not before this Court. The Court thus denies as moot the ADC's motion for summary judgment on Mr. Beard's retaliation claim.

### IV. Arkansas Civil Rights Act Claims

Mr. Beard's claims against the ADC under the ACRA are barred by the doctrine of sovereign immunity. The Eleventh Amendment bars any suit against a state in federal court unless the state has consented to suit or Congress has unambiguously abrogated the states' Eleventh Amendment immunity. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54–56 (1996). The ADC is a state agency that is "the sole creation of the state," has "no separate identity" from the state, and cannot be stripped of its official character. *See Glick v. Henderson,* 855 F.2d 536, 540 (8th Cir.1988). The ACRA specifically reads "[n]othing in this subchapter shall be construed to waive the sovereign immunity of the State of Arkansas." Ark. Code Ann. § 16-123-104. It is clear that the Arkansas legislature did not intend to waive sovereign immunity by enacting the ACRA, and the ADC did not consent to suit. Mr. Beard concedes this argument in his response (Dkt. No. 27, ¶ 3). Therefore, all ACRA claims Mr. Beard alleges against the ADC are barred by sovereign immunity. The ADC's motion for summary judgment on these claims is granted.

## V. Title VII Claims

Mr. Beard can establish a *prima facie* claim of race discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012). Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson*, 643 F.3d at 1043–44 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Therefore, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. *Id.* A plaintiff with strong direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, irrespective of whether his strong evidence is circumstantial. *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* (quoting *Griffith*, 387 F.3d at 736).

### A. Direct Evidence Analysis

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks

omitted). Mr. Beard has presented no direct evidence of discrimination. Accordingly, the Court will proceed through the *McDonnell Douglas* analysis for Mr. Beard's claims.

### B. *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). If a plaintiff makes out a *prima facie* case, he creates a presumption of unlawful discrimination, and the burden shifts to the defendant to come forward with evidence of a legitimate nondiscriminatory reason for its actions. *Id*. "If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual." *Id.*

To make out a *prima facie* case of race discrimination, plaintiff must show: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007). The ADC does not dispute that Mr. Beard can satisfy the first three prongs of the test to make out his *prima facie* case. The ADC claims that Mr. Beard will be unable to present sufficient evidence to show that a similarly situated employee outside the protected class was treated differently. The ADC also contends that, even if Mr. Beard can establish a *prima facie* case, he cannot demonstrate pretext. In support of the fourth element of his *prima facie* case and in support of his claim of pretext, Mr. Beard alleges that similarly situated Caucasian officers within the ADC were not disciplined as harshly for engaging in the same or similar conduct for which he was terminated.

The Eighth Circuit "has two lines of cases on the standard to determine whether employees are 'similarly situated' at the *prima facie* stage of the *McDonnell Douglas* test." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (quoting *Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009)). The first line of cases "sets a low threshold, requiring only that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* (quotation omitted). The other line of cases "more rigorously requires that the employees be similarly situated in all respects." *Id.* (quotation omitted).

Even if Mr. Beard can establish a *prima facie* case of discrimination, the Court determines he cannot survive summary judgment on the issue of pretext. The ADC has articulated legitimate, non-discriminatory reasons for firing Mr. Beard. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (shifting the burden to defendant to provide a legitimate, non-discriminatory reason for plaintiff's termination where plaintiff makes out a *prima facie* case of discrimination). The ADC cited both Mr. Beard's leaving inmates unattended while he went into Church's Chicken and his exchange with Mr. Kumpe as reasons for his termination (Dkt. No. 24-7, at 4). Since the ADC provided a legitimate, non-discriminatory reason for the termination, the burden returns to Mr. Beard to present evidence that the reasons offered by the ADC are a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To prove pretext, Mr. Beard must both discredit the employer's asserted reason for termination and show the circumstances permit drawing the reasonable inference that the real reason for terminating him was his race. *Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005). The proffered non-discriminatory reasons for termination need not be factually correct so long as the employer honestly believed the asserted grounds at the time of the termination. *Id.* at 762.

Mr. Beard attempts to establish a reasonable inference of discrimination by comparing his situation to potential comparators. "At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Bone,* 686 F.3d at 956 (quoting *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds by Torgerson,* 643 F.3d 1031). To succeed at the pretext stage, Mr. Beard must show that he and the potential comparators he identifies were "similarly situated in all relevant respects." *Id.* (quoting *Rodgers,* 417 F.3d at 853). That is, the employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)).

The Court has reviewed the record evidence relating to potential comparator Officer Golden, who is Caucasian. The Court finds, viewing the facts in the light most favorable to Mr. Beard, that Mr. Beard and Officer Golden were neither "similarly situated in all respects," nor were they "involved in or accused of the same or similar conduct."

Viewing the facts in the light most favorable to Mr. Beard, the record indicates that on December 11, 2011, Officer Golden violated security at a work release site to pick up work release inmates and left three or four inmates unattended on the van he drove. Officer Golden was told to leave the site by a superintendent at the work release site and argued with the superintendent for a minute or two before leaving the building. When Officer Golden returned to the vehicle, he accelerated without all inmates properly seated according to Post Orders, causing Inmate Dismuke to fall out of the van. Inmate Dismuke reported the incident to an Officer Ramsey and a Sergeant Porterfield. Officer Golden's sole punishment was a "verbal counseling"

by Sergeant Porterfield until Mr. Beard reported the incident again on January 19, 2012. The facts indicate that a formal investigation occurred only after Mr. Beard reported the incident to Deputy Warden Taylor. After this investigation, Officer Golden was suspended without pay for six days and placed on probation for a year.

The ADC contends that Mr. Beard's and Officer Golden's situations differed in at least four ways (Dkt. No. 23, at 12–13). The ADC maintains that (1) Officer Golden's infractions did not stem from his performance of personal errands or shopping while on duty; (2) Officer Golden did not abandon his vehicle with inmates inside; (3) while both officers argued with their respective work release supervisors, Officer Golden's argument did not result in him being asked to leave the premises entirely but only his being asked to leave a secure area and return to his van, which he did; and (4) Officer Golden did not threaten his work release sponsor such that the sponsor felt it necessary to cancel the Work Release Program if Officer Golden continued to transport inmates to the sponsor's facility. The Court acknowledges that there is some evidence in the record before it indicating a staff meeting was held wherein Mr. Beard asked Major Plant whether officers could stop to get something to eat and Major Plant allegedly told officers they could stop to get something to eat but not to do other kinds of shopping or personal errands. The Court also acknowledges that, based on this, Mr. Beard contends he honestly believed he was not violating ADC policy by stopping at Church's Chicken.

Even with that and viewing the facts in the light most favorable to Mr. Beard, this Court concludes Mr. Beard and Officer Golden are not sufficiently similarly situated to be proper comparators. There is no indication that the sponsor with whom Officer Golden spoke alleged that he felt threatened by Officer Golden or that Officer Golden gave the impression that he was "wanting to fight" which is the impression Mr. Kumpe alleges he had after his exchange with

14

Mr. Beard (Dkt. No. 24-5). Further, there is no indication that the sponsor who dealt with Officer Golden reported to the ADC that Officer Golden was no longer allowed on the sponsor's property and that, if he returned to the sponsor's property, the sponsor might cancel the contract with the ADC's Benton Unit Work Release program, which is the report the ADC received about the sponsor with whom Mr. Beard dealt (Dkt. No. 24-4, at 3, ¶ 9). The Court acknowledges that Mr. Beard disputes Oakley's version of these events, but the ADC was entitled to find Oakley's version of these events credible. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (determining that courts may not sit in judgment of employers as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination"). The factors above distinguish Officer Golden from Mr. Beard.

As for the other potential comparators Mr. Beard identified in discovery responses, the ADC in its statement of undisputed facts identifies several reasons why these individuals are not proper comparators to Mr. Beard (Dkt. No. 24, ¶¶ 90–100). Mr. Beard does not refute these reasons in his response to the ADC's motion for summary judgment. Therefore, the Court concludes these individuals are not proper comparators.

As to some of the individuals Mr. Beard identified in discovery as potential comparators, he generally alleges that he as well as other employees, some of whom are Caucasian, have all purchased food at a McDonald's connected to a gas station with inmates waiting in the ADC vehicle. The Court concludes that these general allegations do not suffice to meet Mr. Beard's burden at the pretext stage.. Even if true, these allegations do not make the potential comparators similarly situated to Mr. Beard in all relevant respects. None of these potential comparators engaged in an exchange with a work release sponsor that purportedly escalated to

the level Mr. Beard's exchange with Mr. Kumpe did. Moreover, none of these incidents identified by Mr. Beard appear to have been reported to the ADC, and no employee, including Mr. Beard, was reprimanded for these actions. For these reasons, the Court finds these alleged unreported incidents are not valid comparators for the *McDonnell Douglas* analysis. *See Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 22 (D.D.C. 2004) ("plaintiff undercuts his argument by suggesting that there is no evidence that the [alleged incidents of proposed comparators] reached the attention of management"); *Young v. Daughters of Jacob Nursing Home*, 2011 WL 2714208, *6 (S.D.N.Y. July 12, 2011), *aff'd sub nom. Young v. Daughter of Jacob Nursing Home, (D.O.J.)*, 491 F. App'x 263 (2d Cir. 2012) (stating that, were the Court to consider plaintiff's proposed comparators, plaintiff's proffer would fail in part because at least some of the events on which plaintiff relied were not reported to defendant).

In his response to the ADC's motion for summary judgment, Mr. Beard identifies Mr. Broadway as a potential comparator. He also attempts to rely on allegations made by James Langley, who claims that on one occasion during the Fall 2012, almost one year after Mr. Beard's termination, Mr. Langley and Mr. Vinyard stopped at a restaurant in Benton for food (Dkt. No. 28-14). There is no indication that Mr. Broadway, Mr. Langley, or Mr. Vinyard had an exchange with a work release sponsor like Mr. Beard's exchange with Mr. Kumpe. Further, when examining Mr. Beard's affidavit and statement of material facts in dispute, it is clear that Mr. Beard does not contend Mr. Broadway left inmates in a van or on a bus while shopping in the Fred's Store. Instead, he specifically states: "In May 2011, Plaintiff witnessed a colleague, Mr. John Broadway (a white male), in the early afternoon in the month of May 2011, alight from an ADC van. Mr. Broadway, also on occasion, transported work release inmates." (Dkt. No. 28, ¶ 50). Mr. Beard does not state these two alleged events occurred on the same day at the same

time—leaving the ADC van and transporting work release inmates. These same allegations are missing from Mr. Langley's affidavit; he does not state that inmates were left unattended in an ADC vehicle during the alleged incident. For all of these reasons, the Court concludes there is insufficient evidence in the record to identify Mr. Broadway as a proper comparator or to rely on Mr. Langley's affidavit at the pretext stage.

Thus, even if Mr. Beard could meet his burden of making out a *prima facie* case of race discrimination, he cannot meet his burden at the pretext stage, and the ADC is entitled to summary judgment on his Title VII race discrimination claims.

\* \* \*

For these reasons, the Arkansas Department of Correction's motion for summary judgment as to Mr. Beard's Arkansas Civil Rights Act and Title VII claims is granted. Mr. Beard's race discrimination claims are hereby dismissed with prejudice. All other motions in this case are hereby denied as moot.

SO ORDERED this 22nd day of October, 2013.

_____
KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE